

FILED
HARRISBURG, PA

2009

MARY E. D'ANDREA, CLERK
Per _____

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SECURITIES AND EXCHANGE COMMISSION,

      **Plaintiff,**

      **v.**

ROBERT GLENN BARD and
VISION SPECIALIST GROUP, LLC,

      **Defendants,**

:
:
:
:
:
:
:
:
:
:
:
:

1:09-CV-1473

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1. This matter involves an ongoing fraud being conducted by Robert Glenn Bard ("Bard") through Vision Specialist Group, LLC ("Vision Specialist") (collectively, "Defendants"), an investment adviser registered with Pennsylvania and

West Virginia.  Bard currently has at least $4.4 million in advisory client assets under

management in over 150 accounts.  From at least 2005 to the present, Bard and

Vision Specialist have targeted unsophisticated investors with promises of high

yields and safety of principal, telling clients that they had invested in safe

investments such as bonds, certificates of deposits, and money market funds, and

showing, as proof, consistently rising or stable account values.

  2.  In reality, Bard squandered hundreds of thousands of dollars or more of

client funds by making risky (and losing) investments in penny stocks and other

securities and borrowing on margin.  Compounding that fraud, on a number of

occasions, he fraudulently overstated account values when reporting to his clients.

  3.  Specifically, Bard, through Vision Specialist, perpetrated his scheme by

failing to fully disclose, and materially misrepresenting, the types of investments he

made for clients and the performance of clients' accounts.  He created false

statements misrepresenting the true value of client accounts and used Vision

Specialist's operating account (also known as the "Sundry" account) to cover

customer withdrawals and pay margin calls so that clients believed their accounts had

funds that they did not have.  In addition, for at least one client, Bard and Vision

Specialist charged fees although Bard represented that he would not.  Furthermore,

Bard forged client authorization forms to transfer funds between accounts to conceal

the dissipation of assets.  Bard also misrepresented to clients the reasons why two

different brokerage firms terminated their relationships with Bard and Vision Specialist.

4.    By masking his improper investments and the dwindling balances of his clients' accounts through various misrepresentations, Bard maintains his client relationships and continues to earn advisory fees from his unknowing clients. Bard's scheme has survived because many of his clients trust him – in many instances without question. He has marketed himself as a deeply religious man and benefits from his and his family's reputation in his small rural community.

5.    As a result of the conduct described in this Complaint, all of the Defendants have violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

## JURISDICTION AND VENUE

6.    The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Sections 209(d) and (e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and (e)], to enjoin such acts, transactions, practices, and courses of business; obtain

disgorgement, prejudgment interest and civil penalties; and such other and further

relief as the Court may deem just and appropriate.

7.    This Court has jurisdiction over this action pursuant to Section 22(a) of

the Securities Act [15 U.S.C. § 77v(a)], Sections 21(e) and 27 of the Exchange Act

[15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. §

80b-14].

8.    Venue in this district is proper under Section 22(a) of the Securities Act

[15 U.S.C § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section

214 of the Advisers Act [15 U.S.C § 80b-14].  Certain of the acts, transactions,

practices and courses of business constituting the violations alleged herein occurred

within the Middle District of Pennsylvania, and were effected, either directly or

indirectly, by making use of the means or instruments of transportation or

communication in interstate commerce, or the means or instrumentalities of interstate

commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS

9.    **Robert Glenn Bard**, age, 43, resides in Warfordsburg, Pennsylvania.

According to Vision Specialist's most current Form ADV filed with Pennsylvania

and West Virginia, Bard is the Managing Member and sole owner of Vision

Specialist.  Bard has never been registered with the Commission in any capacity.

From December 1993 to December 2004, Bard was employed as a registered

representative (stock broker) at various Financial Industry Regulatory Authority ("FINRA") member firms.  In September 2004, Bard was terminated from his position after his brokerage firm discovered that he had prepared and submitted investment documents that contained forged customer signatures and other irregularities.  Bard subsequently joined another firm as a registered representative, and three months later, on December 1, 2004, Bard was terminated when that firm learned of his prior activities.  In September 2004, FINRA reviewed Bard's termination from the first firm and on October 6, 2005, Bard signed an Acceptance, Waiver and Consent and agreed to be barred from association with any FINRA member, ending his career as a representative of any broker-dealer.

10.    **Vision Specialist Group, LLC**, a Pennsylvania limited liability company, located in Warfordsburg, PA, is registered with West Virginia and Pennsylvania as an investment adviser.  Bard incorporated Vision Specialist in Pennsylvania on December 16, 2004 and is the firm's managing member and only employee.  On May 21, 2009, Vision Specialist filed a Form ADV with Pennsylvania reporting assets under management of approximately $9 million with 140 accounts for 101 to 250 clients in the past fiscal year.  Now, however, Bard has at least $4.4 million in assets under management in 154 accounts at two broker-dealers.  Although the large majority of Vision Specialist's clients live in and around Warfordsburg, a small rural town in Fulton County, Pennsylvania, with approximately 2,800

residents, there are also clients in Maryland, Tennessee and West Virginia. Vision Specialist has never been registered with the Commission in any capacity.

## FACTS

### VISION SPECIALIST STRUCTURE AND ACCOUNT MANAGEMENT

11.    At all times relevant to the facts alleged in this Complaint, Vision Specialist was controlled by, and acted by and through, Bard. Bard has complete control of the operations of Vision Specialist and makes all of the investment decisions for advisory clients' accounts.

12.    Vision Specialist claims to provide its clients with fee-based advisory services as well as financial planning advice. While Vision Specialist clients maintain their own investment accounts, the standard investment advisory agreement signed by clients ("Advisory Agreement") conveys to Bard and Vision Specialist "discretionary authority." The Advisory Agreement states that Vision Specialist has "full power and authority to supervise and direct the investment of assets in the [client accounts]" without the need to consult with the client on a transaction by transaction basis. Nothing in the Advisory Agreement allows Bard or Vision Specialist to omit material information regarding the nature or type of client investments or make misrepresentations to clients.

13.    According to the Advisory Agreement, all accounts are subject to an annual management fee not to exceed 5%. The Advisory Agreement further

provides that the fee is deducted quarterly based on the assets under management, but also may be done on an annual basis. Any additional services provided to the client, such as estate planning, financial consultation, insurance consultation, and/or tax consultation are subject to a maximum fee of $150 per hour.

14.    From at least January 2005 to March 2009, Broker A provided custody and execution services for Vision Specialist client accounts. On March 12, 2009, following an internal investigation that revealed comingling of Vision Specialist accounts with clients' funds, unauthorized transfers from a client's IRA account and the charging of excessive advisory fees, Broker A terminated its relationship with Bard and Vision Specialist.

15.    Bard misrepresented to his clients the actual reason that his relationship with Broker A ended. Bard fraudulently told his clients that Broker A decided to terminate relationships with "small" investment advisers, characterizing Vision Specialist as another "victim" of the downturned economy. Upon termination, Broker A transferred all of Vision Specialist's accounts to its retail division, which had the effect of preventing Bard from having access to, or control over, the accounts. However, Bard then actively encouraged his clients to sign documents necessary to move with him to a new broker-dealer to continue their relationship.

16.    On March 19, 2009, Bard and Vision Specialist were granted custodial services at Broker B, and shortly thereafter, at least some Vision Specialist clients

began to sign the forms necessary to transfer their accounts to Broker B.

17.    On April 27, 2009, Broker B terminated its relationship with Bard and Vision Specialist by sending an e-mail to Bard stating that it was terminating the custodial relationship due to "recently surfaced regulatory disqualifications." Upon information and belief, Bard has not informed any clients of the actual reason that his relationship with Broker B ended.

18.    Shortly thereafter, Bard secured custodial services at Broker C. Upon information and belief, Vision Specialist and Bard are asking clients that remained at Broker A to transfer directly to Broker C.

19.    As of July 14, 2009 Vision Specialist had $583,363.28 in assets under management in 41 accounts with Broker B. All Vision Specialist clients at Broker B are in the process of transferring their accounts to Broker C. According to Broker C, as of June 30, 2009, Vision Specialist had $3,782,525.80 in assets under management in 113 accounts. Between Broker B and Broker C, Bard and Vision Specialist now have approximately $4.4 million under management in 154 accounts. As of June 30, 2009, Broker A held approximately $1.7 million in investor assets in approximately 230 accounts for which Bard and Vision previously served as investment adviser. If clients continue to transfer their accounts from Broker A to Broker C, Vision Specialist's assets under management could reach $6 million. Upon information and belief, Bard continues to seek new clients.

## BARD AND VISION SPECIALIST USED RELIGION, REPUTATION, AND TRUST TO LURE AND RETAIN CLIENTS

20.    From at least January 2005 and continuing to the present, Bard targeted unsophisticated investors who live in and around the small rural community of Warfordsburg, in Fulton County, PA, with promises of high yields and safety of principal.

21.    Many clients hired Bard and Vision Specialist as their investment advisers because they knew and respected Bard's father, because Bard presented himself as someone with strong moral values and religious beliefs, and because they knew of him and his family in the small community.

22.    Bard's marketing materials and website are replete with religious overtones. For example, the Vision Specialist website home page begins with a Bible "Verse of the Week" as well as "Quote of the Week." The website describes Bard as:

> born and raised in Fulton County, PA. His godly parents were
> both farmers and pastors, instilling in Robert the value of hard
> work, good choices and a vision for this life and beyond.
> Robert is committed first to his Lord and Savior, Jesus Christ,
> and then to his wife . . . and their three children.

23.    Based on some or all of the above reasons, Bard developed the deep trust and confidence of his advisory clients. Bard took advantage of this trust and confidence to encourage his clients not to worry about their investments. For example, until at least March 23, 2009, in a section labeled "FAQ" on the website,

Bard advised clients that they need not maintain paperwork regarding their account because Vision Specialist keeps copies of all account related documents at its office. The site further advised clients to "discard carefully (shred or burn)" their monthly statements as soon as the new statement arrives.

24.     Bard's efforts to build the trust of his clients allowed him to perpetrate his fraud largely without fear of detection.

## BARD'S SCHEME TO DEFRAUD

25.     Many of Bard and Vision Specialist's clients entrusted Defendants with their entire life savings. As a result, clients asked that their monies be kept in "safe" investments that had no risk to the principal. Bard agreed to abide by these wishes, and repeatedly misrepresented that these clients' accounts were in "secure" investments that had "high returns." In response to clients' requests, Bard also agreed to invest in conservative, low-risk investments like money market funds, interest-bearing accounts or certificates of deposit ("CDs"). In several instances, Bard promised that the investments would not drop in value and promised levels of return from more than 6.5% to as much as 17%.

26.     Vision Specialist and Bard, however, did not follow the instructions of their clients or abide by Bard's representations. Instead of investing in conservative investments to maintain principal, Vision Specialist and Bard invested in stocks and funds that declined significantly, and used margin loans to fund purchases, increasing

10

client risk, and ultimately resulting in margin calls when the values of the securities declined.

27.    Many clients did not read their statements from Broker A because they found them confusing and difficult to read.  Bard, therefore, was able to conceal the true nature of the investments he was making and their poor performance through various methods that masked and misrepresented the value of the clients' accounts – sometimes overstating client holdings by hundreds of thousands of dollars.

## BARD MADE FRAUDULENT MISREPRESENTATIONS TO CLIENTS REGARDING THEIR INVESTMENTS

28.    Bard and Vision Specialist invested large percentages of client funds in stocks such as L International Computers, Inc. ("L International Computers"), a penny stock Pink Sheet issuer, whose trading was temporarily suspended by the Commission in March 2008 due to concerns over the accuracy and adequacy of publicly disseminated information concerning its status as a publicly-traded company.  They also invested clients in Dune Energy, Inc. ("Dune Energy") stock, a development stage, independent oil and gas exploration company with operations on the coast of West Texas and Louisiana.  The Dune Energy Form 10-K states that investing in Dune Energy "involves a high degree of risk."  Clients were also invested in Advantage Energy Income Fund ("Advantage Energy"), a Canadian oil and gas royalty trust that provided variable monthly cash distributions to unitholders from the revenues generated through the sale of crude oil and natural gas.  Advantage

Energy's Annual Report for 2008 notes that "oil and natural gas prices have
fluctuated widely during recent years and are determined by economic, and in the
case of oil, political factors, " noting such risk factors such as, "hostilities in the
Middle East and global terrorism."

29.     In addition, Bard and Vision Specialist have invested many clients in
emerging market exchange traded funds such as iShares MSCI Malaysia. The
iShares MSCI Malaysia Index Fund seeks to provide investment results that
correspond generally to the performance of publicly traded securities on the Kuala
Lumpur Stock Exchange. The prospectus for the iShares Fund notes this investment
is "subject to a greater risk of loss than those in developed markets. This is due to,
among other things, greater market volatility, lower trading volume, political and
economic instability, greater risk of market shutdown and more governmental
limitations on foreign investments than typically found in developed markets."

**A.     Client A**

30.     Client A and his wife are residents of Needmore, PA. Client A opened
his first account managed by Bard in November of 2005. In June of 2006, Client A
retired after 39 years of working at the same company. Shortly thereafter, he decided
to hire Bard and Vision Specialist to manage the entirety of his retirement savings.

31.     Client A is not a sophisticated investor and he relied on Bard's
experience and expertise to manage his family's life savings, which was worth

approximately $750,000 at the time he hired Bard and Vision Specialist. From approximately November 2007 to June 2009, Client A and his wife had four accounts managed by Bard and Vision Specialist that were custodied at Broker A.

32.     Client A told Bard that he wanted his funds to be kept in "safe" investments. Bard understood this. On several occasions, Bard made false representations to Client A that his investments were safe and that the value of his holdings was increasing. Bard actually invested Client A and his wife's money in securities such as Advantage Energy, iShares MSCI Malaysia, and L International Computers that ultimately lost significant amounts of their value.

### B.     Client B

33.     In April 2007, Client B, who resides in Everett, PA and his wife, who recently passed away, opened a joint account in the amount of $146,000 with Vision Specialist and Bard as advisers. This account was custodied at Broker A.

34.     At the time of the initial investment, Client B told Bard that he wanted his funds to be kept in safe, secure investments. Bard represented that he would abide by this request.

35.     In late 2008, Client B, aged 70, discussed with Bard that his wife had to enter a nursing home and that he was hoping to draw additional income from his investments. However, Client B made it clear to Bard that he did not want to take any risks that could jeopardize their current holdings.

36.     In early 2009, Bard sent Client B a letter that fraudulently misrepresented that Bard was "…getting the large portion of your funds into bonds that right now are yielding 17%. That would give you a profit of approximately $17,000 this year, which I think is better than the 4% on a CD." Bard further wrote, this "strategy will serve you and [your wife] well."

37.     Shortly thereafter, Bard then sent another letter to Client B in which he falsely stated that the returns from the bond fund would not appear until the next statement because it paid returns in the middle of the month. However, Bard never invested Client B's accounts in any bond or bond fund. Nor had he invested in financial instruments that could guarantee the promised 17% return. Instead, Bard ultimately invested nearly all of Client B's assets in a Canadian oil and gas royalty trust that provided variable monthly cash distributions to unitholders from the revenues generated through the sale of crude oil and natural gas. In less than three weeks, the investment that Bard made suffered over $30,000 in unrealized losses.

**C.     Client C**

38.     Client C, aged 39, currently lives in Knoxville, TN. When she first became an advisory client of Bard and Vision Specialist, she lived in Maryland, four miles south of Warfordsburg, PA. Client C had very little experience in the stock market or in investments and she did not consider herself a sophisticated investor.

39.     In 2005, Client C asked Bard to manage, in safe investments that would

provide her with a steady stream of income, approximately $75,000 she received

when her former husband passed away.  An account was opened for her at Broker A.

40.    Client C did not review her account statements and relied on Bard to

provide her with periodic updates on her investments over the telephone.  At various

times following her initial investment, up through and including January or February

2009, Bard falsely represented to Client C that her money was in CDs.  Instead, like

other investors, Bard had placed the majority of Client C's holdings in Advantage

Energy, L International Computers, Dune Energy, iShares MSCI Malaysia, and

iShares MSCI Singapore.

**D.    Clients D & E**

41.    Client D and his wife, Client E, aged 56 and 53, respectively, are

residents of Warfordsburg, PA and became clients of Bard in the summer of 2000,

when Client D rolled over a $93,000 IRA from a previous employer to an account

under Bard's management.  Client D had recently retired from a major medical

equipment company where he worked as a factory service representative.  Client E is

a registered nurse.

42.    Clients D & E are not financially sophisticated investors and relied

solely on Bard to guide them through their financial investments.  Client D & E

invested with Bard because they knew of Bard's father, and because their daughter

married Bard's cousin.  They had great faith and trust in Bard as their investment

adviser because he was a man who presented himself as someone with strong moral values and religious beliefs. Due to Client D & E's relationship of trust and confidence with Bard, they kept very few documents related to their accounts.

43.     Clients D & E had multiple accounts advised by Bard custodied at Broker A.

### 1.     Client D & E's Semper Fi Memorial Fund

44.     In April 2006, Clients D & E created the Semper Fi Memorial Fund (the "Memorial Fund") in memory of their son, a marine, who died in Iraq in 2005.

45.     The Memorial Fund's purpose was to educate high school students about the sacrifices others had made for their country, to teach students the "price of freedom," and to pay for field trips for three area high schools to visit Arlington National Cemetery. An account for the Memorial Fund was opened at Broker A.

46.     The Memorial Fund was initially funded with $3,500 from Clients D & E, who then solicited donations for the Memorial Fund. Client E kept her own record of all of the donations and withdrawals that were used to pay for the school trips.

47.     When setting up the Fund, Clients D & E told Bard that they wanted the money kept in something like a money market account or a CD, because they wanted a safe investment. Clients D & E told Bard that they wanted a stable balance to be maintained in the account, and that the only withdrawals would be to fund the high school field trips. Bard represented that he would abide by these requests.

48.    Clients D & E never reviewed copies of the account statements for the Memorial Fund because they trusted the information Bard provided to them.

49.    Bard initially respected the investment guidelines set forth by Clients D & E and invested the Memorial Fund in safe investments such a money market fund. However, by September 2006, the Memorial Fund contained only 27% of its assets in money market funds and the remaining 73% was invested in L International Computers and two international index funds.

50.    In 2007 and 2008, Bard continued to actively invest the Memorial Fund's assets in stocks using margin loans – unbeknownst to Clients D & E. By the end of December 2008, the equity in the account was $3,498. All of the Memorial Fund's assets – $6,245 – were still invested in the same investments and had with a margin loan balance of $2,747. Unrealized losses totaled $16,942. By 2009, due largely to losses caused by the risky investments, the account value was only $3,426 with a more than $2,500 margin loan.

51.    In April 2009, following the termination of Vision Specialist's custody rights at Broker A, all of the assets in the account, with a value of just over $1,400, were transferred to the retail side of Broker A out of the control of Mr. Bard. By this point, the account had suffered net realized losses of $11,400 and it held just over 4,000 shares of L International Computers, that were virtually worthless. The remaining value of the account had been lost due to investment declines and resulting

margin calls.

52.    Over the course of Bard's management, Bard consistently falsely represented to Clients D & E that the account was "doing well" and omitted telling them that he was investing in stocks and was taking out margin loans.

## 2.    Client D & E's Joint Account

53.    In November 2006, Clients D & E opened a joint account with Bard at Broker A that was funded with $400,400 in proceeds from their son's life insurance policy. They asked Bard to manage that account.

54.    Clients D & E told Bard that their investment goal was to maintain a $400,000 balance and that they planned to use any accrued profits for vacations and to pay down debt. They told Bard that they wanted their money to be invested in safe, secure investments. Bard assured Clients D & E that he understood and misrepresented that he would follow their instructions.

55.    On or about September 30, 2008, based on news stories about how poorly the markets were doing, Client E sent Bard an e-mail expressing concern that their accounts might be losing money. In response, in October 2008, Bard met with Clients D & E at their home and reassured them about the status of their accounts. Bard falsely represented to them that their money was in safe money market funds and that there was nothing to worry about.

56.    On or about February 4, 2009, Bard again visited Clients D & E at their

home. At this time, he falsely informed them that they were invested in something called "TCUUX," which he described as a money market fund earning between 7% and 9% annually.

57.    In reality, neither Clients D & E nor Vision Specialist has ever been invested in the TCUUX fund. In fact, "TCUUX," which stands for Trust for Credit Unions Ultra-Short Duration Government Bonds, is an institutional fund open exclusively to credit unions. Bard instead had invested Client D & E's joint account in stocks and funds and traded on margin. The declines on these investments eventually decimated the value of the joint account.

### E.    Client F

58.    The treasurer ("Client F") for the local volunteer fire company ("Fire Company"), and one-time president, opened three accounts with Bard in approximately January 2002. Bard continued to manage the Fire Company's funds after starting Vision Specialist.

59.    When Client F opened the Fire Company's accounts with Bard, he told him that it "wanted safe, secure investments" that could be accessed whenever needed. Bard assured Client F that he understood this objective.

60.    At various times since opening the accounts, Bard made false representations that the accounts were invested in secure investments earning a fixed rate of return. For example, in January 2008, Bard provided a document to Client F

in which he represented that the Fire Company's investments "were yielding 6.75% and were consistent with [the] goals of the preservation of capital." The summary further provided, "[t]he investment is backed and secured by the full faith of the U.S." These statements were false.

61.     In reality, Client F's accounts were evenly invested between stocks and a money market. The investments were not providing a fixed rate of return.

62.     Bard also made fraudulent misrepresentations to Client F regarding fees. Bard told Client F that he did not charge the Fire Company any management fees for advising its accounts. However, Bard charged the Fire Company fees on at least 14 different occasions during 2007 and 2008, totaling approximately $6,718.

**F.    Clients G and H**

63.     Client G, and his wife, Client H, 68 and 65 years old, respectively, are residents of Warfordsburg, PA, who invested their retirement money with Bard and Vision Specialist.

64.     In 2003, Client H invested $10,000 she received from her mother with Bard and believes that Bard opened an account for her at Broker A. There is, however, no individual account in Client H's name at Broker A.

65.     In 2005, Client G, a retired truck driver, rolled over $102,230 from his 401(k) to a managed account with Bard and Vision Specialist. A short time later, Client G rolled over an additional $94,773. Clients G & H also opened a joint

account advised by Bard and Vision Specialist in 2007. These accounts were custodied at Broker A.

66.    Clients G & H, like the other clients, are not financially sophisticated. Client H complained to Bard that she had difficulty understanding the account statements for Broker A and, therefore, she and her husband relied on Bard to assist them.

67.    When Clients G & H opened their accounts with Bard, they told him that they "were afraid of stocks," and wanted to be invested in "safe" investments. Bard agreed to invest them in safe investments. In fact, at one point, when Client H questioned Bard about a statement that seemed to show stocks in the account, Bard claimed they were special stocks that had "a hold" on them, which he explained meant that the stocks could not lose value. This was false.

68.    Contrary to his representations, however, Bard invested Clients G & H in securities such as Advantage Energy, Dune Energy, L International Computers, and DCT Industrial Trust, a commercial real estate REIT. None of these securities had a "hold" on them, and in fact, each lost significant value while held in Client G & H's accounts.

69.    Upon information and belief, the Commission alleges that Defendants have made similar or related misrepresentations to numerous other clients, in addition to those discussed herein.

70.    As a result of Bard and Vision Specialist's disregard for client instructions and their materially false and misleading statements regarding investments and fees, Defendants defrauded clients, breached their fiduciary duty and failed to meet their duty of full and fair disclosure of all material facts and their obligations to employ reasonable care to avoid misleading clients.

## BARD FRAUDULENTLY MISREPRESENTED CLIENT ACCOUNT VALUES AND FABRICATED CLIENT ACCOUNT STATEMENTS

71.    Defendants have used a variety of methods to mislead clients into believing their account balances were much greater than they were in order to conceal account losses caused by their improper investments and other practices.  In most of these instances, Bard and Vision Specialist's advisory clients found the brokerage statements confusing and difficult to understand and looked to Bard to report the values of their accounts.  Bard took this opportunity to conceal the actual values of the advisory clients' accounts.

72.    At all times when Bard falsely represented account values, Bard knew or had access to the actual value of client accounts directly from Brokers A, B and C. Accordingly, Bard knew he was overstating and exaggerating the value of customer accounts.

73.    For some clients (Client A and Clients D & E), Bard fabricated official looking account summaries using Moringstar.com, an internet-based portfolio valuation tool.  For at least one client (Client F), Bard provided false account value

information on Vision Specialist letterhead that he claimed would "summarize" the actual statements. Furthermore, for at least one family (Clients G & H), Bard actually altered real information on an existing brokerage account electronic document in order to create a false brokerage account statement. Each of these methods was designed to misrepresent and overstate to the clients the actual value of their dwindling accounts.

### A.     Client A and Clients D & E

74.     For both Client A and Clients D &  E (husband and wife), Bard intentionally fabricated false and misleading one-page statements using Morningstar.com, a publicly available online service that can be used to monitor the value of a given portfolio. Bard input false portfolio information into the website and then printed "statements" that he presented to each of these clients during visits to their homes.

75.     Bard represented that these "statements" showed the values of the clients' various accounts. However, the values that Bard attributed to the accounts were false and materially overstated the actual value of the client accounts, concealing the large losses that Defendants' trading had caused.

76.     Specifically, from at least March 3, 2008 to June 3, 2009, Bard provided Client A with several false "statements" that he generated using Morningstar.com that concealed the severe losses in each of Client A's four accounts.

77.    In the most egregious example, in March of 2009, the false Morningstar.com printouts that Bard claimed reflected Client A and his wife's accounts overstated Client A and his wife's total holdings by as much as $766,000.

78.    In addition, on or about May 28, 2009, Bard again visited Client A and misrepresented the value of his accounts.  At that time, Bard used a computer to access smartmoney.com, another publicly available website that can be used to calculate the value of a given portfolio.  Bard showed Client A information that Bard claimed represented Client A's account.  That information showed a value of over $800,000.  However, at that time, Client A's actual accounts were worth less than $90,000.

79.    Similarly, between December 2008 and February 2009, Bard visited Clients D & E and provided them with "statements" printed from Morningstar.com.  Each of these documents fraudulently overstated the true values of Client D & E's accounts.

80.    The Morningstar.com documents that Bard presented reflected, on at least two occasions, that Clients D & E had more than half a million dollars in two of their accounts.  However, because of Bard's unauthorized and inappropriate investments, in reality, they had less than $50,000.

**B.    Client F**

81.    At the end of each month Bard provided Client F with a one-page

document on Vision Specialist letterhead that listed the balances for each Fire

Company account.

82.    On several occasions, the account balance provided by Defendants was

false and materially overstated the amount of funds in Client F's accounts.

83.    For example, in August 2008, Bard and Vision Specialist provided

Client F with false summary balances for each of the Fire Company accounts as of

the end of July 2008. In total, Bard falsely overstated the value of the accounts by

$47,786.

### C.    Clients G & H

84.    From October 2008 to April 2009, Clients G & H received shorter,

simplified, easier to read "statements" from Bard in the mail ("Simple Statements").

Each Simple Statement purportedly represented the values of Client H's individual

account, Client G's IRA, and Clients G & H's joint account. The last page of the

Simple Statement was a plain white piece of paper that read in boldface and capital

letters, "TOTAL ALL PORTFOLIOS" and listed the purported cumulative value of

the accounts. Clients G & H only reviewed the final page of the Simple Statement.

85.    Upon information and belief, Bard manipulated real account documents

from Broker A to create these Simple Statements that fraudulently overstated account

values and appeared to clients to be official broker information. Notably, although

there was a Simplified Statement for an "individual" account for Client H, in reality,

no such account existed at Broker A.

86.    Using the false Simple Statements, Bard and Vision Specialist consistently misrepresented the value of Client F & G's accounts by at least $150,000, and, in one month, overstated the value by approximately $190,000.

87.    In mid-June 2009, Bard presented Clients F & G with yet another form of a fabricated account statement.  This fabricated account statement was on the purported letterhead of Broker C and purported to represent the total value of Client G & H's accounts as $273,249.  At that time, however, there was only one Client G & H account at Broker C -- the joint account.  That account had a zero balance (the account has not been transferred from Broker A due to an illiquid penny stock holding).  Client G & H's only funds were still at Broker A.

88.    Upon information and belief, the Commission alleges that Defendants have made similar or related misrepresentations to other clients, in addition to those discussed, herein.

89.    By fraudulently misrepresenting the value of various clients' holdings, Defendants defrauded clients, breached their fiduciary duty, and failed to meet their duty of full and fair disclosure of all material facts and their obligations to employ reasonable care to avoid misleading clients.

## BARD FORGED DOCUMENTS AND DIRECTED UNAUTHORIZED TRANSFERS BETWEEN ACCOUNTS

90.    For at least one client, Bard forged, or directed others to forge, client

signatures on Broker A's IRA Distribution/Withholding Form ("IRA Distribution

Form").

91.    Because of Bard's poor investment choices and reckless margin trading,

the value of Client D & E's joint account had dropped significantly in a very short

amount of time.

92.    Bard actively concealed this fact from these clients, who continued to

make withdrawals.  In an attempt to further conceal the losses in the account, Bard

effected the unauthorized IRA distributions in order to fraudulently conceal margin

calls and to cover client checks written on the joint account.

93.    For example, on October 5, 2008, Client E informed Bard via e-mail

that she would be writing a check that week from the joint account for $10,000.  On

October 9, Broker A received an IRA Distribution Form faxed from Vision Specialist

requesting a one-time distribution from Client D's IRA account in the amount of

$15,000 to the joint account bearing a signature resembling that of Client D.

However, Client D had not signed the IRA Distribution Form.

94.    In total, from October 2008 to February 2009, Bard caused nine

unauthorized distributions from Client D's IRA to the joint account.

95.    Neither Client D nor Client E ever signed an IRA Distribution Form to

withdraw money from any IRA.  Neither Client D nor Client E ever authorized Bard,

or anyone else at Vision Specialist, to take withdrawals from any IRA account for

any reason and they never authorized Bard, or anyone else at Vision Specialist, to sign their name for any purpose.

96.    When confronted by Clients D & E about the forgeries, Bard admitted that the signatures were forged, but denied signing the forms himself.  Upon information and belief, Bard either himself forged the signatures or directed a then-current employee of Vision Specialist to forge the signatures.

97.    By forging Client D's name or directing another person to forge Client D's name on the IRA Distribution Forms, Defendants defrauded clients, breached their fiduciary duty, and failed to meet their duty of full and fair disclosure of all material facts and their obligations to employ reasonable care to avoid misleading clients.

## BARD USED VISION SPECIALIST'S OWN ACCOUNT TO COVER CLIENT MARGIN CALLS AND WITHDRAWALS TO FURTHER MASK TRUE BALANCES

98.    In a further attempt to conceal the true declining values of his clients' accounts and maintain client relationships, which had the effect of allowing Bard to continue to collect management fees, Bard fraudulently used Vision Specialist's own Sundry account to cover margin calls in the client accounts.

99.    Specifically, on at least three occasions Bard covered margin calls on Clients D & E's joint brokerage account by improperly writing checks from Vision Specialist's Sundry account for deposit in Client D & E's joint brokerage account.

100.   Similarly, Vision Specialist's bank records also show that, on at least one occasion in 2009, Bard paid money to the Fire Company with money he received from his parents, but concealed this from the Fire Company.  On March 20, 2009, Bard issued a check for $15,900 from a Vision Specialist bank account payable to the Vision Specialist operating account at Broker A.  At or around that time, he deposited a check from his parents' joint checking account (signed by his mother), dated March 24, in the amount of $15,900 into the same Vision Specialist bank account.  From the operating account, Bard then wrote a $16,000 check to the Fire Company, dated March 18, that did not clear until March 31.  Rather than coming from the Vision Specialist operating account, Client F believes this money came from one of the Fire Company's accounts at Broker A.

101.   By not disclosing the margin calls and transferring funds between the Vision Specialist account and client accounts, Defendants defrauded clients, breached their fiduciary duty, and failed to meet their duty of full and fair disclosure of all material facts and their obligations to employ reasonable care to avoid misleading clients.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

102.   The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 101, inclusive, as if the same were fully set forth

herein.

103.    From at least January 2005 through the present, as a result of the conduct alleged herein, Defendants knowingly or recklessly, in connection with the offer, purchase, or sale of securities, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)    employed devices, schemes or artifices to defraud;

(b)    obtained money or property by means of, or made, untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

104.    By engaging in the foregoing conduct, Defendants have violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

105.   The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 104, inclusive, as if the same were fully set forth herein.

106.   From at least January 2005 through the present, as a result of the conduct alleged herein, Defendants, while acting as investment advisers, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, knowingly or recklessly have employed and are employing devices, schemes and artifices to defraud their clients and prospective clients; and have engaged and are engaging in transactions, practices and courses of business which operate as a fraud or deceit upon their clients and prospective clients.

107.   By engaging in the foregoing conduct, Defendants have violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

## I.

Permanently restraining and enjoining Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b5], thereunder.

## II.

Permanently restraining and enjoining Defendants from violating Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-4, 80b-6(1), 80b-6(2)].

## III.

Ordering Defendants to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint.

## IV.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C.§ 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C.§ 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## V.

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,


/s/ Scott A. Thompson_____
Daniel M. Hawke
Elaine C. Greenberg
G. Jeffrey Boujoukos (PA #67215)
Scott A. Thompson (PA #90779)
Colleen K. Lynch
Paulina Jerez

Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE
COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740
thompsons@sec.gov

Dated:  July 30, 2009